# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

REGENTS OF THE UNIVERSITY OF
MINNESOTA,

Plaintiff,

v.

AT&T MOBIILITY LLC,

Defendant

ERICSSON, INC., AND NOKIA OF AMERICA
CORP.,

Intervenor- Defendants

Civil No. 14-4666 (JRT/TNL)

---

REGENTS   OF   THE   UNIVERSITY   OF
MINNESOTA,

Plaintiff,

v.

SPRINT   SOLUTIONS,   INC.   AND   SPRINT
SPECTRUM L.P.,

Defendants,

ERICSSON,   INC.,   NOKIA   OF   AMERICA
CORP.,   AND   NOKIA   SOLUTIONS   AND
NETWORKS US LLC,

Intervenor- Defendants

Civil No. 14-4669 (JRT/TNL)

---

REGENTS   OF   THE   UNIVERSITY   OF
MINNESOTA,

Plaintiff,

v.

T-MOBILE USA, INC.,

Defendant,

ERICSSON,   INC.,   NOKIA   OF   AMERICA
CORP.,   AND   NOKIA   SOLUTIONS   AND
NETWORKS US LLC,

Intervenor- Defendants

Civil No. 14-4671 (JRT/TNL)

---

REGENTS OF THE UNIVERSITY OF MINNESOTA,

                                        Plaintiff,

v.

CELLCO PARTNERSHIP D/B/A VERIZON WIRELESS,

                                        Defendant,

ERICSSON, INC. AND NOKIA OF AMERICA CORP.,

                                        Intervenor- Defendants

Civil No.  14-4672 (JRT/TNL)

---

**MEMORANDUM OPINION AND ORDER ON MOTIONS TO EXCLUDE EXPERT TESTIMONY**

---

Aamir Abdulqader Kazi, **FISH & RICHARDSON, PC**, 1180 Peachtree Street Northeast, Atlanta, GA 30309; Conrad A Gosen, **FISH & RICHARDSON, PC**, 60 South Sixth Street, Suite 3200, Minneapolis, MN 55402; Frank E. Scherkenbach, Lawrence K. Kolodney, Whitney Reichel, and Daniel Haran Wade, **FISH & RICHARDSON, PC**, One Marina Park Drive, Boston, MA 02210; John-Paul Robert Fryckman, **FISH & RICHARDSON, PC**, 12860 El Camino Real, Suite 400, San Diego, CA 92130; Katherine D. Prescott, **FISH & RICHARDSON, PC**, 500 Arguello Street, Suite 400, Redwood City, CA 94603; Brian J. Slovut and Carrie Ryan Gallia, **OFFICE OF THE GENERAL COUNSEL FOR THE UNIVERSITY OF MINNESOTA**, 200 Oak Street Southeast, Suite 360, Minneapolis, MN 55455; William R. Woodford, **AVANTECH LAW, LLC**, 80 South Eighth Street, Suite 900, Minneapolis, MN 55402, for plaintiff;

Barbara P. Berens, Kari S. Berman, and Carrie L. Zochert, **BERENS & MILLER, PA**, 80 South Eighth Street, Suite 3720, Minneapolis, MN 55402; Benjamin Hershkowitz, Josh A. Krevitt, Laura Corbin, and Robert Scott Roe, **GIBSON, DUNN & CRUTCHER LLP**, 200 Park Avenue, New York, NY 10166; Neema Jalali, **GIBSON, DUNN & CRUTCHER LLP**, 555 Mission Street, Suite 3000, San Francisco, CA 94105; Yeepay Audrey Yang, **GIBSON, DUNN & CRUTCHER LLP**, 2001 Ross Avenue, Suite 2100, Dallas, TX 75201, for defendant AT&T Mobility LLC;

David E. Finkelson and George Brian Davis, **MCGUIRE WOODS LLP**, Gateway Plaza, 800 East Canal Street, Richmond VA 23219; Jason W. Cook, **MCGUIRE WOODS LLP,** 2000 McKinney Avenue, Suite 1400, Dallas, TX 75201; John A. Cotter and John Anders Kvinge, **LARKIN HOFFMAN DALY & LINDGREN, LTD**, 8300 Norman Center Drive, Suite 1000, Minneapolis, MN 55437; Karen D. McDaniel, **TAFT STETTINIUS & HOLLISTER LLP**, 2200 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for defendants Sprint Solutions, Inc, Sprint Spectrum, LP, T-Mobile USA, Inc.;

Frank C. Cimino, Jr., Jeffri A. Kaminski, and Leslie A. Lee, **VENABLE LLP**, 600 Massachusetts Avenue Northwest, Washington, DC 20001; 55437; Karen D. McDaniel and Mark G. Schroeder, **TAFT STETTINIUS & HOLLISTER LLP**, 2200 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for defendant Cellco Partnership d/b/a Verizon Wireless

Casey Lynne Shomaker, Jonathan Nathanial Powers, Nicolas M. Mathews, Alexander Jefferson Chern, and Warren H. Lipschitz, I, **MCKOOL SMITH, PC**, 300 Crescent Court, Suite 1500, Dallas, TX 75201; Kevin Hess, **MCKOOL SMITH, PC**, 303 Colorado Street, Suite 2100, Austin, TX 78701; Steven Peters, **MCKOOL SMITH, PC**, 1999 K Street Northwest, Suite 600, Washington, DC 20006; Karen D. McDaniel, O. Joseph Balthazor, Jr., and Michael M. Lafeber, **TAFT STETTINIUS & HOLLISTER LLP**, 2200 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402; Theodore Stevenson, III, **ALSTON & BIRD LLP**, 2200 Ross Avenue, Suite 2300, Dallas, TX 75201, for defendant-intervenor Ericsson, Inc.

Brianne Straka, David Aaron Nelson, Marc Lawrence Kaplan, Nathaniel Andrew Hamstra, Athena Diane Dalton, Harrison Rose, Rajat Khanna and Stephen Andrew Swedlow, **QUINN EMANUEL URQUHART & SULLIVAN, LLP**, 191 North Wacker Drive, Suite 2700, Chicago, IL 60606; Eva N. Edmonds, **QUINN EMANUEL URQUHART & SULLIVAN, LLP**, 111 Huntington Avenue, Suite 520, Boston, MA 02199; Jonathan A. Strauss, Christopher Proczko, and Sonia L. Miller-Van Oort, **SAPIENTIA LAW GROUP PLLC**, 120 South Sixth Street, Suite 100, Minneapolis, MN 55402; Karen D. McDaniel, **TAFT STETTINIUS & HOLLISTER LLP**, 2200 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for defendant-intervenors Nokia of America Corp. and Nokia Solutions and Networks US LLC;

Plaintiff Regents of the University of Minnesota ("Regents") filed this action against Defendant cellular network companies ("Defendants"), alleging patent infringement on cellular data transmission technology. Both parties compiled expert reports computing damages under a hypothetical negotiation model. Now, both parties have filed Motions to Exclude expert testimony on various grounds. Because all of the objections can be addressed adequately on cross-examination, the Court will deny both Motions to Exclude.

## BACKGROUND

### I.      FACTS

The Court has previously explained the factual history of this case and the only question presented here relates to damages expert reports, thus the factual background will be limited in that respect.

Both Regents and the Defendants submitted damages expert reports, and each seeks to exclude the others' report. (Mot. Exclude Expert Test. Lauren Kindler, June 1, 2023, Docket No. 542; Mot. Exclude Expert Test. Matthew Lynde, June 2, 2023, Docket No. 592.)[1] Lauren Kindler is the expert for the Defendants. (Decl. Conrad Gosen ¶ 2, Ex. 1 ("Kindler Report") ¶ 1, June 1, 2023, Docket No. 558.) Matthew Lynde is the expert for Regents. (Decl. Jonathan Powers ("Powers Decl.") ¶ 2, Ex. 1 ("Lynde Report") ¶ 10, June 2, 2023, Docket No. 595.) Neither party opined about damages for lost profits. (*See* Kindler Report; Lynde Report; Powers Decl. ¶ 3, Ex. 2 ("Lynde Suppl. Report"), June 2,

_____

[1] All docket numbers in this Order correspond to ECF No. 14-4666.

2023, Docket No. 596.)  Instead, each expert submitted a report detailing an analysis of hypothetical negotiations to reach a conclusion about reasonable royalties.  (*See generally* Kindler Report; Lynde Report; Lynde Suppl. Report.)

Lauren Kindler received a B.A. and an M.A. in economics and has been providing financial, economic, and damages quantifications for almost 20 years.  (Kindler Report ¶¶ 6–7.)  In compiling her opinion, she reviewed documentary evidence, deposition testimony, and the report created by Matthew Lynde.  (*Id.* ¶ 11.)  Ultimately, Ms. Kindler reached a reasonable lump sum royalty range of roughly $400,000 to $9.2 million, which she then apportioned to the various Defendants based on U.S. market share.  (*Id.* ¶¶ 12–13.)  Her opinion was informed by Regents' actual negotiations with Samsung and Intellectual Ventures ("IV"), Intervenors' comparable license agreements, third-party valuation of the patent portfolio, and the Defendants' efforts to expand their services that include the accused products, all under the framework dictated by *Georgia-Pacific*.  (*Id.* ¶¶ 12, 14, 73.)  She also discussed at length the framework and calculations made by Dr. Lynde.  (*See id.* § IX.)

Dr. Matthew Lynde received a B.A. and a Ph.D. in economics and has over 35 years of experience practicing applied economics.  (Lynde Report ¶ 2.)  Dr. Lynde based his opinion on the documents from this litigation, publicly available filings, deposition testimony and conversations with Regents' technical experts.  (*Id.* ¶¶ 11–12.)  He used two different models to calculate damages for the Defendants.  (*Id.* ¶ 15.)  He calculated

the total damages amount as $217.5 million for his uniform distribution model and $600.6 million for his non-uniform distribution model. (*Id.*) Ultimately his calculations resulted from his use of a royalty rate from an Intervenor's comparable license, apportioned to the facts of this case, and a royalty base of the total subscriber revenue of the Defendants. (*Id.* ¶¶ 151–284.) Throughout his report, he evaluated each *Georgia-Pacific* factor. (*Id.*) Dr. Lynde supplemented his report with one agreement he found comparable, the General Access Solutions, Ltd. ("GAS") Agreement. (*See generally* Lynde Supp. Report.)

## II.    PROCEDURAL HISTORY

In 2014, Regents filed a Complaint against the Defendants asserting claims of direct and indirect infringement and willful blindness. (*See, e.g.*, Am. Compl., Jan. 30, 2015, Docket No. 25.) The Court dismissed Regents' willful blindness claims. (Mem. Op. & Order Mot. Dismiss, Sept. 29, 2015, Docket No. 45.) Ericsson, Nokia of America Corp., and Nokia Solutions intervened as defendants. (*See, e.g.*, Order, Mar. 30, 2016, Docket No. 131; Order, Mar. 31, 2016, Docket No. 136.) In 2017, the Court granted a motion for a limited stay pending a decision on inter partes review from the United States Patent and Trademark Office ("USPTO"). (*See, e.g.*, Order, May 19, 2017, Docket No. 237.) That stay was lifted in 2020, at which time the Court heard and decided claim construction arguments. (*See* Mem. Op. & Order Construing Claim Terms, Aug. 5, 2022, Docket No. 342.) Some claim terms were later amended pursuant to party stipulation. (Order Amending Construction Claim Terms, Dec. 9, 2022, Docket No. 385.) The Court recently issued an order on the parties' motions for summary judgment. Regents now seek to

exclude the testimony and opinion of Defendants' damages expert Lauren Kindler, and

the Defendants seek to exclude the same of Regents' damages expert Matthew Lynde.

**DISCUSSION**

## I.   STANDARD OF REVIEW

Federal Rule of Evidence 702 governs the admissibility of expert testimony and

provides the following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[2]

---

[2] On December 1, 2023, new language of Rule 702 became effective. Fed. R. Evid. 702. The language changed but the substantive law did not. *See* Fed. R. Evid. 702 advisory committee's note to 2023 amendment. The amendment merely attempts to clarify the law as it was originally enacted in 2000. *See id.*; Greene v. Ledvance LLC, No. 3:21-256, 2023 WL 8636962, at *3 n. 1 (E.D. Tenn. Dec. 13, 2023). The Court will apply the new language of Rule 702, but the result would be the same regardless of whether the Court applied the current or prior version of the rule.

The district court has a gate-keeping obligation to make certain that all testimony admitted under Rule 702 satisfies these prerequisites and that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). The proponent of the expert testimony has the burden of establishing by a preponderance of the evidence that the expert is qualified, that his or her methodology is scientifically valid, and that "the reasoning or methodology in question is applied properly to the facts in issue." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757–58 (8th Cir. 2006). Expert testimony is inadmissible if it is "speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Id.* at 757.

The Court has wide discretion in determining the reliability of expert testimony. *Kumho Tire Co., LTD v. Carmichael*, 526 U.S. 137, 152 (1999). However, the Eighth Circuit instructs that "[c]ourts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Marmo*, 457 F.3d at 758. "[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 570 (8th Cir. 1988). "Only if [an] expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929–30 (8th Cir. 2001) (quotation omitted).

## II.     DAMAGES EXPERTS

The patent damages provision states that a patent infringement claimant is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."  35 U.S.C. § 284.  "Despite the broad damages language of § 284, patentees tend to try to fit their damages cases into the 'lost profits' framework, or else fall back on the statutory grant of a reasonable royalty."  *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1366 (Fed. Cir. 2008), *mandate recalled and amended in* 557 F.3d 1377 (Fed. Cir. 2009).

A reasonable royalty can be calculated through a hypothetical negotiation. *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 868–69 (Fed. Cir. 2010).  Courts have broadly adopted the *Georgia-Pacific* framework to assist in evaluating the hypothetical negotiations.  *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (describing the factors used to evaluate a hypothetical negotiation).  The Federal Circuit has made clear that the *Georgia-Pacific* factors are unprioritized, and a damages expert is not required to use all fifteen factors.  *ResQNet.com*, 594 F.3d at 869; *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012).  The goal of the hypothetical negotiation method is to determine what the patentee would have accepted before the alleged infringement began.  *Lucent Techs. Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324–25 (Fed. Cir. 2009).  The hypothetical negotiation contains some level of uncertainty.  *Id.* at 1325.  Both damages experts used the hypothetical negotiation model,

and the parties do not dispute this usage.  The parties instead dispute the application of the hypothetical negotiation framework.

### A.    Lauren Kindler

Regents argue that Lauren Kindler's expert report should be excluded for two reasons.  First, because her opinion is speculative and unreliable as it was based on incomplete negotiations with IV.  Second, because she used the Global Technology Transfer Group ("GTT") report which did not disclose its methodology.

### i.  Licensing Negotiations

In her calculations, Lauren Kindler utilized two different negotiations between Regents and a third party.  Neither of these negotiations resulted in a license.  In fact, Regents has never licensed this technology.  Regents take issue only with Ms. Kindler's use of the license negotiations with IV.

Proposed licenses may be used in overall evaluation, although they may have less evidentiary value than actual license agreements.  *See Whitserve*, 694 F.3d at 29–30.[3] Courts have found that unaccepted offers are probative when the offer is reliable or consistent with commercial value.  *MLC Intell. Prop., LLC v. Micron Tech., Inc.*, No. 14-3657, 2019 WL 2716512, at *14 (N.D. Cal. June 28, 2019) (citing *Atl. Thermoplastics Co.,*

---

[3] *Deere & Co. v. Int'l Harvester Co.*, 710 F.2d 1551, 1557 (Fed. Cir. 1983) (holding that a district court's finding that an offer with little persuasive value was inadmissible constituted error); *CellTrust Corp. v. ionLake, LLC*, 625 F. Supp. 3d 810, 862–63 (D. Minn. 2022) (describing the use of reseller agreements when no actual licensing agreements for the patented invention were available as a factual dispute that can be challenged on cross-examination).

*Inc. v. Faytex Corp.*, 5 F.3d 1477, 1482 (Fed. Cir. 1993)).  Licensing offers made after litigation began or in anticipation of litigation are less reliable because it may reflect a desire to avoid litigation.  *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078–79 (Fed. Cir. 1983).

Regents first dispute that Ms. Kindler found the license negotiations to be "sufficiently comparable" to the hypothetical negotiation and then suggest that even if they were sufficiently comparable, Ms. Kindler did not account for any differences.  It is common understanding that comparable licensing agreements need not be identical. Regents present no caselaw to suggest that this would be any different for licensing negotiations when no agreement had been reached.  Instead, in such evaluations the expert must properly account for the differences between the license negotiations and hypothetical negotiation, which Ms. Kindler did here.  She analyzed several differences between the licensing negotiation and the hypothetical negotiation such as the breadth of the portfolio, potential future patents, and the exclusivity of the license.  In fact, it is hard to imagine a scenario where Ms. Kindler assessed the differences without first finding that the negotiations were sufficiently comparable.  The Court will not exclude her opinion on that basis.

Regents also question the evidence Ms. Kindler used to show Regents' alleged counteroffer.  Because they never officially made a counteroffer, Regents assert that Ms. Kindler's reliance on any documentation suggesting the contrary is speculative and

unreliable. However, the counteroffer issue raises questions about the factual basis of Ms. Kindler's report, not the methodology. The fact that Regents never formally countered the offer made by IV does not mean that evidence of what the counteroffer may have been is necessarily unreliable. Here, Ms. Kindler presents multiple mediums of evidence suggesting a general counteroffer, including internal documents from IV about phone calls and deposition testimony from Regents' Technology Marketing Manager. Regents may challenge the reliability of this evidence, but the Court will not exclude her opinion on that basis.

Lastly, Regents challenge that even if Ms. Kindler's valuation was satisfactory, she erroneously calculated the profit participation. This issue is the most problematic. In her report, Ms. Kindler simply applies the 10% profit participation to the upfront payment of $5 million. There is some evidence to suggest that the parties considered the upfront payment, but neither party discussed profit participation. Instead, Ms. Kindler took the 10% profit participation directly from IV's initial offer. It is unclear what the parties intended with the profit participation or what would have been included in a finalized license agreement. However, because these patents were never actually licensed, the ultimate profit is unknown, and a guess at that value may have been even more speculative than Ms. Kindler's method of calculation. Ms. Kindler's saving grace is that she did explain how she calculated the profit participation and, at the very least, accounted for that element of the license negotiations instead of ignoring it.

### ii. GTT Report

Regents hired GTT to evaluate the value of the patent portfolio.  Ms. Kindler used this third-party valuation as one data point in her report.  Regents now claim that because GTT did not disclose its methodology in creating the report, Ms. Kindler's use of the GTT report should be excluded because the report itself is inherently unreliable.  Regents correctly note that an expert's calculation cannot be free from explanation, but courts have not unequivocally disallowed third-party valuations.

Valuations can be relevant in reasonable royalty determinations.  *Viasat, Inc. v. Space Sys./loral, Inc.*, No. 12-260, 2013 WL 12061801, at *5 (S.D. Cal. Jan. 14, 2013).  Courts have allowed damages experts to testify about independent valuations of patented technology.  *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, No. 3-1431, 2008 WL 928539, at *4, *6 (N.D. Cal. Apr. 4, 2008) (upholding a damages award where the jury heard testimony about the third-party valuation over objections).  However, an expert's calculations cannot amount to a black box where the methodology is completely obscured from view; instead, the expert must explain how the information allowed her to arrive at the damages estimation.  *NXP USA, Inc. v. Impinj, Inc.*, No. 20-1503, 2023 WL 3933877, at *5 (W.D. Wash. June 8, 2023).

The parties dispute two distinct issues with regard to the GTT report; the extent to which Ms. Kindler used the report, and the reliability of the GTT report itself.  However, neither of these issues speaks to the reliability of Ms. Kindler's methodology.

-13-

First, Ms. Kindler explained that this report did not impact her final damages calculation. Instead, she describes using it as a reference to what Regents would have known at the time of the hypothetical negotiation. Her use, or lack thereof, of the report is a factual dispute not appropriate for exclusion.

Second, the GTT report is not necessarily unreliable as it does describe its process as based on statistical correlation to other completed patent transactions and discounts for patent age. The GTT report itself may not be the best source of information, but the Court is unwilling to categorically exclude a third-party evaluation as one of many data points. Any issues either party has with the GTT report is a subject for trial testimony, not a basis for exclusion.

### B.    Matthew Lynde

The Defendants move to exclude Matthew Lynde's expert report for three reasons. Defendants' primary issue with Dr. Lynde's report is his use of total subscriber revenue as the royalty base. Second, that Dr. Lynde inflated the value of the patents through forward citations without accounting for patent age. Third, that because Dr. Lynde disregarded many license agreements but used the GAS Agreement without accounting for significant differences, his methodology is unreasonable.

### i.    Royalty Base

For each hypothetical license, Dr. Lynde calculated a reasonable royalty using each company's entire LTE and 5G wireless subscriber revenue. The Defendants argue that using this royalty base without apportioning it properly is such an egregious error in

methodology that the report must be excluded entirely.  The Court does find this application to be highly concerning, and yet it merely walks very close to, but not over, the line of exclusion.

Generally, when an infringing product is but one small part of a larger network of components, the royalty base must be apportioned to account for only the damage caused by infringement.  *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 66–67 (Fed. Cir. 2012).  The entire market value rule is a narrow exception to this apportionment standard.  *Id.* at 67.  However, this exception only applies if the patentee can show that the market for the entire product is driven by the infringed product.  *Garretson v. Clark*, 111 U.S. 120, 121–22 (1884).  It is not sufficient that the patented feature is important, essential, or valuable, or that customers chose products that contained the patented feature; the patented feature must alone drive the customer's decision to purchase the product.  *LaserDynamics*, 694 F.3d at 67–68; *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 979 (Fed. Cir. 2018) ("Where the accused infringer presents evidence that its accused product has other valuable features beyond the patented feature, the patent holder must establish that these features do not cause consumers to purchase the product.").

If the entire market value rule does not apply, the royalty should be reduced to the smallest salable portion containing the patented product.  *Power Integrations*, 904 F.3d at 977.  If apportionment is required, there is no universally accepted way it must be

accomplished.  *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018).  Apportionment can be completed through the royalty base, the royalty rate, or some combination of the two.  *Id.*  A royalty may be entirely appropriate if it begins with the entire market value, and then the royalty rate at which it is applied does the work of reducing the overall royalty to the damages attributable to the infringed product.  *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014).  Ultimately, the combination of the royalty base and royalty rate must reflect the value of the infringed product, and not more.  *Finjan LLC v. SonicWall, Inc.*, 84 F.4th 963, 976 (Fed. Cir. 2023).

If a sufficiently comparable license is used in the reasonable royalty calculation, additional apportionment may not be necessary, as it may be built in.  *See Vectura Ltd. v. Glaxosmithkline LLC*, 981 F.3d 1030, 1040–41 (Fed. Cir. 2020) (describing the use of the sufficiently comparable license as both the royalty rate and royalty base).  Courts have found the sufficiently comparable license method reliable because it effectively constrains the parties to the market's value of the patent.  *Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1303 (Fed. Cir. 2015).

While Regents would like to rest on the sufficiently comparable license theory of built-in apportionment, the theory is not supported by Federal Circuit case law.  It is true that Dr. Lynde used a royalty rate from what could be construed as a sufficiently comparable license.  The problem arises with relation to the royalty base.  Dr. Lynde pulls

the royalty rate from an Intervenor's license which the Intervenor would apply to a royalty base of handset equipment.  Dr. Lynde applies the same Intervenor royalty rate to the Defendants' total subscriber revenue.  But built-in apportionment only applies when the royalty **rate and base** originate from a sufficiently comparable license.  Here, Dr. Lynde exclusively uses the royalty rate from a comparable license and applies to a significantly larger royalty base.  This application is violative of the formula prescribed by the Federal Circuit for built-in apportionment and on this theory, Dr. Lynde's opinion falters.

Dr. Lynde cannot rely on built-in apportionment, but he could apportion with a different method.  Apportionment can be done through the royalty base, royalty rate, or a combination.  *Exmark*, 879 F.3d at 1348.  Dr. Lynde admits that he did not apportion the royalty base but alleges that he adequately apportioned the royalty rate by: (1) using only the Intervenors' royalty rates for user equipment instead of total royalty for LTE/5G patents, and (2) using the lower of actual royalty and royalty caps.  The Court is not convinced these are apportionments rather than simply a choice of which value to apply.  However, the Court's skepticism relates to the factual basis of Dr. Lynde's opinion rather than the methodology.  Theoretically, Dr. Lynde could save his analysis by apportioning the royalty rate appropriately.

Finally, the parties dispute the application of *Cal. Inst. of Tech. v. Broadcom Ltd.* ("*Cal Tech*"), 25 F.4th 976 (Fed. Cir. 2022).  In *Cal Tech*, the Federal Circuit found that a two-tiered damages analysis allowing for different royalty rates at different points in the

supply chain was legally unsupported and contrary to longstanding precedent. *Id.* at 994. The Federal Circuit acknowledged that if there was evidence that there would have been two distinct hypothetical negotiations, then the two-tiered model may be appropriate. *Id.* at 993–94.

Cal Tech is certainly instructive for the Court, but it does not dispose of Dr. Lynde's opinion. There are factual differences between Dr. Lynde's report and *Cal Tech* that weigh heavily against exclusion. For example, Dr. Lynde allegedly used a different royalty base later in the supply chain instead of a different royalty rate. The Defendants did not cite any cases that specifically find the use of a royalty base later in the supply chain to run afoul of *Cal Tech*. Second, Dr. Lynde specifically describes his method as using the same royalty rate for all entities in the supply chain and applying that to their respective revenues. Dr. Lynde cannot point to any prior situation where entire subscriber revenue has been used, but he does articulate that revenue is often used as a royalty base. While his argument lacks precision, the Court understands it to mean that Dr. Lynde believes he is applying universal methodology across the entire supply chain. So, instead of increasing the royalty base later in the supply chain, the number increases simply because the revenue is greater. But, for all potential infringers, he uses a royalty base of revenue. The Court finds this argument difficult to follow, but the Court will not extend *Cal Tech*'s ruling to this case because of the significant factual differences.

### ii. Forward Citations

In Dr. Lynde's Non-Uniform Distribution Model, he augments the value of the patents at issue based on their forward citations without accounting for patent age. Forward citation methods are not always unreliable and have been used extensively in economic literature. *Better Mouse Co., LCC v. SteelSeries ApS*, No. 2:14-198, 2016 WL 3611528, at *2 (E.D. Tex. Jan. 5, 2016). But forward citation methods are only reliable when they are sufficiently tied to the facts of the specific case. *Comcast Cable Commc'ns, LLC v. Sprint Commc'ns Co., LP*, 262 F. Supp. 3d 118, 147 (E.D. Penn. 2017). Offering no explanation for why the forward citation method is appropriate presents an issue of reliability. *See Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-3999, 2015 WL 4272870, at *8 (N.D. Cal. July 14, 2015). Accounting for patent age is a method for tying forward-citation analysis to the facts of the specific case. *Id.* (citing *Oracle Am., Inc. v. Google Inc.,* No. 10-3561, 2012 WL 877125, at *2 (N.D. Cal. Mar. 15, 2012)).

Before reaching the parties' primary arguments, it is worth noting that forward-citation methods are still accepted as a method to determine the relative value of the patents. Any argument to the contrary is false.

Specific to Dr. Lynde's use of the forward-citation method, the Defendants argue that a failure to account for patent age mandates exclusion. But they have presented insufficient evidence justifying exclusion because of a failure to account for patent age. To suggest as much is a misunderstanding of the standard. The standard does not explicitly instruct that a forward-citation method must account for patent age but rather

that the method be "sufficiently tied to the facts of the specific case." *Comcast Cable*, 262 F. Supp. 3d at 147. Dr. Lynde points to the specific technology and when it became widely available to explain why he may not have needed to account for patent age. Whether that statement is persuasive should be decided by the jury, as it speaks to the factual basis of Dr. Lynde's opinion, not the methodology.

### iii. GAS Agreement

The Defendants and Intervenors in this case submitted nearly 200 licensing agreements that may have been helpful comparisons in the hypothetical negotiation analysis. Dr. Lynde disregarded all such licensing agreements except for one, the GAS Agreement. To be useful, a license agreement must be sufficiently comparable to the license that would result from the hypothetical negotiation. *Lucent Techs.*, 580 F.3d at 1325–26. Comparability is a threshold issue and cannot be loose or vague. *Virnetx, Inc. v. Cisco Sys. Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014). As such, the party proffering the comparable agreement must account for any technological and economical differences. *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010). However, comparable licenses need not be identical because there will always be a level of approximation and uncertainty. *Virnetx, Inc.*, 767 F.3d at 1330.

Dr. Lynde submitted a supplemental report that explained why the GAS agreement is appropriately comparable to the hypothetical negotiation. Defendants claim that Dr. Lynde simply wanted to find an agreement that aligned with his damages amount, but that accusation alone does not necessarily make his use of the GAS Agreement unreliable.

Dr. Lynde attributed the similarity to the technological comparison and the services provided.  He acknowledged that the GAS Agreement was a settlement agreement, but that in his opinion this difference did not disqualify the GAS Agreement as a sufficiently comparable license.  While it is concerning that the only agreement Dr. Lynde found to be comparable was one with a similar damages amount, it is possible that it is the only sufficiently comparable license agreement.  Because Dr. Lynde explained his reasoning and went through the various licensing agreements in his original report, the Court will not exclude Dr. Lynde's opinion based on his use of the GAS Agreement.

## CONCLUSION

Under Rule 702, the Court's responsibility is to exclude evidence that is so fundamentally unsupported that it will not be useful to the jury.  The rule presents a high bar, and the Court is to resolve disputes in favor of admission.  Because none of the objections presented to Lauren Kindler or Matthew Lynde's reports rise to the level of exclusion, the Court will deny both Motions to Exclude.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED that:**

1. Plaintiff's Motion to Exclude Expert Testimony of Lauren Kindler [Docket No. 542][4] is **DENIED**.

2. Defendants' Motion to Exclude Testimony and Opinions of Dr. Matthew Lynde [Docket No. 592][5] is **DENIED**.

DATED:  February 28, 2024
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge

---

[4] ECF No. 14-4669, Docket No. 584; ECF No. 14-4671, Docket No. 576; ECF No. 14-4672, Docket No. 631.
[5] ECF No. 14-4669, Docket No. 623; ECF No. 14-4671, Docket No. 577; ECF No. 14-4672, Docket No. 657.